In re:                    )       Case No. 1:26-bk-00174

                               )       (Chapter 11)

PRECISION TRADES & SERVICES, LLC    )

                               )

         Debtor                 )

_____)

## <u>OBJECTION TO CONFIRMATION OF PLAN OF REORGANIZATION</u>

COMES NOW Middletown Valley Bank ("<u>MVB</u>"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 2002(b)(2), and objects to confirmation of the plan of reorganization (the "<u>Plan</u>") (Docket Entry No. 60), filed by Precision Trades & Services, LLC (the "<u>Debtor</u>"), and in support thereof states as follows:

### Introduction

The Plan suffers from three issues militating in favor of a denial of confirmation, two of which are technical and one of which is substantive. The former—which are readily fixable—stem from the Debtor's failure to adhere to the Federal Rules of Bankruptcy Procedure as they pertain to the form of a plan in a Subchapter V case and from the Debtor's failure to recognize the actual amounts of various creditors' claims (alongside, in at least one case, the Debtor's failure to even recognize the existence of a creditor whose claim has not been subject to objection). In lieu of abiding by these rigors, the Debtor appears to have submitted a free-form plan, more emblematic of a traditional Chapter 11 plan in a case where there does not exist a small business, and to have populated that free-form plan with outdated numbers from schedules that were never accurate in the first instance.

The substantive issue, however, is far more problematic: the Debtor has ignored— seemingly wantonly—the existence of Chapter 5 claims in this case. At a time when litigation

against so-called merchant cash advance entities ("MCAs") sits at the vanguard of emerging Chapter 11 case law, and when the avoidability of payments to MCAs has become part and parcel of both the Chapter 11 and Chapter 7 toolkit, the Debtor has seemingly elected to simply ignore the enormous sums of money it purports to have wrongfully—if not outrightly fraudulently—paid to such an entity in the period preceding the docketing of a petition for relief.

The exclusion of MCA issues from the Plan creates two problems. First, and most conservatively, the failure to acknowledge—much less value—Chapter 5 claims results in a facially errant liquidation analysis. The Debtor has not assessed what a Chapter 7 trustee could recover and, as such, has not assessed how creditors would actually bode in a Chapter 7 liquidation. And, second, such—alongside the technical issues enumerated above—also calls into question the Debtor's attentiveness to the reorganization process alongside the fairness and equitableness of the Plan itself. The Debtor is leaving a very valuable asset—uniquely borne of title 11 of the United States Code (the "Bankruptcy Code")—in the ether, to be effectively abandoned, whilst also asking creditors to receive payments that are palpable discounts of the sums they are acknowledged to be otherwise owed. This is not the framework of a fair and equitable reorganization; this is the framework of an effort to exit Chapter 11 without actually doing the hard work of a debtor-in-possession and pursuing claims that would benefit creditors.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged confirmation of the Plan be denied.

**Argument**

I. **Confirmation of the Plan Should be Denied**

    a. **Chapter 5 Claims are Excluded**

The Debtor's estate holds—at minimum—a fraudulent conveyance claim against National Funding, Inc. ("National Funding") for at least $75,000.00. The Plan, however, not only never discloses the existence of this asset but, too, does not make any provision for the recovery of these monies. This shortcoming, in turn, means the Debtor's liquidation analysis is objectively errant and the Plan comes well shy of looking out for the interests of creditors like MVB.

The transaction with National Funding takes the form of a "Purchase and Sale of Future Receivables" (the "National Funding Agreement"). *See* National Funding Agreement, attached hereto as **Exhibit A**. This is a prototypical merchant cash advance ("MCA") transaction.

Such agreements are something of an emerging topic of legal scrutiny, especially in bankruptcy courts where questions as to the validity—and enforceability—of the documents have been regularly addressed in recent years. The core structure of an MCA transaction is that a merchant (normally a small, retail business) is not borrowing money but, rather, is "selling" a specified percentage of *all* future receivables (*i.e.,* revenues)—reduced, conveniently, to an "estimated" weekly sum—until an agreed amount is paid, in exchange for an upfront infusion of cash. That these transactions appear to closely resemble loans (agreements to pay specified monies, on a specified timeline, until principal and interest are repaid in full) is neither coincidence nor folly: the MCA industry at least bears the optics of working to end-run lending laws while furnishing products that pragmatically resemble the small business equivalent of payday loans.

As observed by the United States Bankruptcy Court for the District of New Jersey, when confronted with two MCA contracts: "a putative present sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment— that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 Bankr. LEXIS 1778, at *19

(Bankr. D.N.J. July 24, 2025) (quoting *In re Watchmen Sec. LLC*, 2024 Bankr. LEXIS 2871 at *4 (Bankr. S.D. Ind. Nov. 20, 2024) (quoting John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019))).

Another bankruptcy court, also confronted with an MCA arrangement, carefully analyzed the financial realities underlying the transaction and concluded, *inter alia*, "[t]hese economic features, most fundamentally the reality that the Debtor bears the risk of non-collection of receivables with Radium2 bearing little if any of that risk, powerfully show the Agreements to be loans." *J.P.R. Mech. Inc. v. Radium2 Cap., LLC (In re J.P.R. Mech. Inc.)*, 2025 Bankr. LEXIS 1319, at *27 (Bankr. S.D.N.Y. May 30, 2025).

Decisions such as the foregoing—noting MCA contracts to actually be loans—have come with grave consequences for recharacterized lenders. The United States Bankruptcy Court for the Eastern District of North Carolina, upon concluding an MCA transaction to actually be a loan, proceeded to note this meant that "[p]ursuant to applicable New York statutory and case law, the MCA Agreement is criminally usurious." *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *33 (Bankr. E.D.N.C. May 16, 2025). The same court went on to accordingly hold the agreement to be void *ab initio*. *Id.*

Less than two months ago, another bankruptcy court found certain MCA agreements usurious under Texas law, *In re Denali Constr. Servs.*, 2026 Bankr. LEXIS 712, at *30 (Bankr. N.D. Tex. Mar. 20, 2026), and awarded both treble damages and attorneys' fees to a borrower, *id.* at *31-36. That case—much like this case—involved a particularly lopsided disparity between the monies received by a merchant and the monies obligated to be repaid by the same merchant: "The difference between the amount Plaintiff received ($350,000) and the amount Plaintiff was

obligated to repay ($1,499,000), or $1,149,000, represents the interest charged on the loan." *Id.* at *29.

Here, the Debtor bartered away $194,999.76 in future receivables for an upfront payment of $150,000.00. *See* National Funding Agreement, attached hereto as Exhibit A, at p. 1. The receivables were then to be collected in weekly sums of $5,416.66, *id.*, which, in turn, means it would have taken 36 weeks for the obligation to be retired (being equal to $194,999.76 divided by $5,416.66). That, in and of itself, is a 30% markup—a sum well in excess of the rates charges for even the most aggressive of private loans. Yet, when considering that payment was to be made in a scant 36 weeks, the annual interest rate comes out to an even more astonishing 52%. Based on a complaint filed in state court, it appears the Debtor at least partially performed under the National Funding Agreement. *See* Complaint, attached hereto as **Exhibit B**.

The National Funding Agreement is governed by California law. *See* National Funding Agreement, attached hereto as Exhibit A, at § 5.1. Under California law, when a loan is guaranteed by a natural person, the commercial exception to the state's usury law is inapplicable and a loan is usurious if interest is charged at a rate in excess of 10% per annum. *See, e.g.*, *Dev. Acquisition Grp., LLC v. eaConsulting, Inc.*, 776 F. Supp. 2d 1161, 1165 (E.D. Cal. 2011) ("Because Mr. Wong guaranteed the debt as an individual, the transaction falls within § 25118(e)(1), and renders inapplicable the usury exemption for commercial loans."); *Moon v. Milestone Fin., LLC (In re Moon)*, 639 B.R. 190, 197 (Bankr. N.D. Cal. 2022) ("The California Constitution fixes the maximum annual interest rate at 10% for 'any loan or forbearance of any money, goods, or things in action.'") (quoting Cal. Const. Art. XV § 1).

The usurious nature of the transaction is only of fleeting relevance, however, because the monies paid to National Funding—and the obligation incurred in the National Funding

Agreement—are avoidable whether they occur in the prism of a loan or a sale of future receivables. The Debtor was, by all accounts, insolvent at the time the agreement was entered into. And the Debtor received well less than reasonably equivalent value (either a sale of an enormous amount of short term receivables at an unconscionable discount, or a loan at a usurious interest rate) for the transaction. So, under both the Bankruptcy Code and state law, this transaction may be avoided. *See* 11 U.S.C. §§ 544, 548; 12 Pa. Cons. Stat. § 5101, *et seq.*

Worse, it is altogether unclear if the National Funding Agreement was the only such agreement entered into by the Debtor and an MCA entity. The Debtor—at the meeting of creditors in this case—indicated funds close to $1 million to have been taken by a former member of the entity. It does not appear the monies taken were the byproduct of excess cash on hand, and there is thusly an abiding concern that other MCA transactions may have been entered into, with other MCA entities, giving rise to other avoidance actions.

There was a sincere and abiding hope the Plan would shed added light on these transactions and the litigation rights stemming therefrom. Unfortunately, however, the Plan does not so much as mentioned these issues. And, through such neglect, the Plan both fails to furnish an accurate liquidation analysis, 11 U.S.C. § 1190(1)(B), and fails to make provisions that are fair and equitable to creditors whose claims are being repaid at significant discounts, 11 U.S.C. § 1191(b).

**b.      The Plan Does Not Conform to Official Form 425A**

Various oddities embrace the formal presentation of the Plan (including the drafting of one section as a first person narrative, *see* Plan, DE #60, at § 2(a)). And while the document is not *per se* difficult to read, the unorthodox format is a clear violation of the rules governing practice in this Honorable Court.

Specifically, the Federal Rules of Bankruptcy Procedure mandate the use of official forms where such documents are available, and only "minor changes" are to be made thereto. *See* Fed. R. Bankr. P. 9009(a). Official Form 425A, in turn, is the plan of reorganization to be utilized by a small business seeking to reorganize in Chapter 11. *See* Official Form 425A. And governing rules contemplate a bankruptcy court "confirm[ing] a plan that substantially conforms to Form 425A[] or . . . to a standard form approved by the court." Fed. R. Bankr. P. 3016(d).

The Debtor has not used Official Form 425A. While there are elements of that form in the Plan, the two documents assuredly ought not be mistaken for one another. And though the Plan might be confirmable in a "traditional" Chapter 11 case (if accompanied by a disclosure statement), such is assuredly not true here, especially since the Plan must not be proposed "by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

**c.     The Debtor is Not in Conformity with the Bankruptcy Code and Has Misstated (and Omitted) Claim in the Plan**

While the overriding objection set forth herein is that the Debtor—by ignoring Chapter 5 claims against one or more MCA entities—has neglected the most basic duties of an entity seeking to reorganize in a manner cognizant of a fiduciary charge to creditors, the Debtor's haphazard approach to Chapter 11 has also been manifest in other forms. The most notable of which is the schedules in this case, which appear to have been prepared long before a petition was actually filed, never updated pre-petition, and then never amended post-petition. Regrettably, the errors in those schedules have now also found their way into the Plan itself.

MVB is scheduled as an unsecured creditor holding a claim for $747,848.00. *See* Schedule E/F, DE #1, at § 3.11. Yet, as demonstrated in MVB's claim in this case, MVB's loan was (i) secured by a UCC Financing Statement, *see* Claims Register 18-1, Part 3, p. 9; (ii) reduced to a

judgment pre-petition, *id.* at Part 4, pp. 2-4; (iii) and further secured by that judgment being recorded in Adams County, Pennsylvania, *id.* at pp. 5-7.

Moreover, the judgment in favor of MVB is for $755,524.29. *Id.* at Part 4, p. 4. And the judgment accrued interest, pre-petition, bringing the same to $793,353.00. *Id.* at Part 2. So the Debtor's schedules are objectively wrong.

This is problematic for two reasons. First, "a debtor has an affirmative duty to amend his schedules to correct errors and omissions. . ." *Johnson v. Meabon (In re Meabon)*, 508 B.R. 626, 632 (Bankr. W.D.N.C. 2014) (citing *Canterbury v. J.P. Morgan Acquisition Corp.*, 958 F. Supp. 2d 637, 651 (W.D. Va. 2013); *In re Clayton*, 235 B.R. 801, 811 (Bankr. M.D.N.C. 1998); *Mitchell Constr. Co. v. Smith (In re Smith)*, 180 B.R. 311, 318, 320 (Bankr. N.D. Ga. 1995)). Since the Debtor has not done so, the Debtor has not "complie[d] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). Such, unto itself, militates in favor of a denial of confirmation.

The second problem, however, is somehow worse: notwithstanding the aforementioned proof of claim, the Plan *still* has the wrong sum for the debt owed to MVB. *See* Plan, DE #60, at § 2.04. Axiomatically, "[a] proof of claim or interest signed and filed under (c) supersedes any scheduling of the claim or interest under § 521(a)(1)." Fed. R. Bankr. P. 3003(c)(5). Yet, with MVB, the Debtor has simply ignored the claim and stood by the scheduled sum—an oversight that, in turn, will minimize the pro rata distributions to be made to MVB under the provisions of the Plan. *See* Plan, DE #60, at § 4.01.

Nor does this problem appear to be unique to MVB. Ameris Bank d/b/a Balboa Capital Corporation has filed an unsecured claim for $8,597.17. *See* Claims Register #16-1. Yet this claim does not appear to be treated anywhere in the Plan. *See* Plan, DE #60, *passim*. The same is true for

the claim of Blue Ridge Financial, Inc., for $28,070.28. *See* Claims Register #15-1. It also appears the Debtor has neglected to treat the claim of SRS Distribution, Inc., for $91,662.20. *See* Claims Register #14-1.

Other claims may also be errant or missing; MVB is, of course, chiefly concerned with its own claim being improperly reduced in the Plan and has not checked every single entry in the Claims Register against the text of the Plan. Regardless, however, the four foregoing errors and omissions are sufficiently problematic as to necessitate denial of confirmation: creditors have been sent a plan of reorganization, and asked to vote thereupon, without that document containing accurate data and with the inaccuracy thusly skewing the *pro rata* distributions each unsecured creditor may reasonably expect to receive should confirmation occur.

## II.     MVB Does Not Oppose Amendment and Re-Balloting

For want of ambiguity: while MVB fervently opposes confirmation of the Plan, MVB assuredly does not oppose permitting the Debtor leave to file—and ballot—an amended plan that actually addresses Chapter 5 claims, that actually discusses dealings with MCA entities, and that actually recites the proper sums of various creditors' claims (while also not omitting claims). This would also allow the Debtor time to amend its schedules and honor that sacrosanct requirement as well.

Moreover, should the Debtor elect to actually pursue the claim(s) against one or more MCA entities that will bring money into the estate, this will allow the Debtor time to take reasonable steps to do so. Should the Debtor be unwilling to do so, MVB would be willing to pursue such claims derivatively, using counsel compensated on a contingent basis. One way or another, however, these are claims that could bring significant money into the estate. And creditors not only have a right to see their proper claim amounts treated in the Plan but, too, to see the Plan make

appropriate provisions to fairly and equitably recover monies that can be used to pay those claims. As of present, the Debtor has not made such provisions. MVB is cautiously optimistic, however, that, with a second chance, the Debtor will do so.

## III.     Conclusion

WHEREFORE, Middletown Valley Bank respectfully prays this Honorable Court deny confirmation of the Plan, and for such other and further relief as may be just and proper.

Respectfully submitted this 20th day of May, 2026.

> **MIDDLETOWN VALLEY BANK,**
> By Counsel
>
> _/s/     Kelsey Swaim Miller_
> Kelsey Swaim Miller (I.D. No. 328655)
> STEPTOE & JOHNSON PLLC
> 1250 Edwin Miller Boulevard, Suite 300
> Martinsburg, WV  25404
> Tel:     (304) 262-3516
> Fax:     (304) 250-1407
> kelsey.miller@steptoe-johnson.com
>
> Maurice B. VerStandig, Esq.
> _Pro Hac Vice Forthcoming_
> VerStandig Law Firm LLC
> 9812 Falls Road #114-160
> Potomac, MD 20854
> Tel :     (301) 444-4600
> mac@mbvesq.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of May, 2026, I served the foregoing *Objection to Confirmation of Plan of Reorganization* with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants:

Lawrence V. Young, Esq.
CGA Law Firm
135 North George Street
York, PA 17401
*Counsel for Debtor*

Joseph P. Schalk, Esq.
Office of the United States Trustee
1501 N. 6th Street
Harrisburg, PA 17102
*U.S. Trustee*

Kate Deringer Sallie, Esq.
Pillar Aught LLC
4201 E. Park Circle
Harrisburg, PA 17111
*Counsel for F&M Trust*

Lisa Ann Rynard, Esq.
Law Office of Lisa A. Rynard
240 Broad Street
Montoursville, PA 17754
*Subchapter V Trustee*

Paige M. Taylor, Esq.
Zwicker & Associates, P.C.
80 Minuteman Road
Andover, MA 01810
*Counsel for American Express National Bank*

/s/ *Kelsey Swaim Miller*
Kelsey Swaim Miller (I.D. No. 328655)
STEPTOE & JOHNSON PLLC
1250 Edwin Miller Boulevard, Suite 300
Martinsburg, WV 25404
Tel: (304) 262-3516
Fax: (304) 250-1407
kelsey.miller@steptoe-johnson.com
*Counsel for Middletown Valley Bank*

Case 1:26-bk-00174-HWV    Doc 67    Filed 05/20/26    Entered 05/20/26 18:05:22    Desc
Main Document    Page 11 of 11