# EXHIBIT A



# PURCHASE AND SALE OF FUTURE RECEIVABLES

| | |
|---|---|
| Agreement #: FWC681546A | Date: 09/15/2023 |
| Seller: Precision Trades & Services LLC DBA Precision Trades & Services | |
| Business Address ███████████████ | |
| City/State/Zip: ████████████████ | Business Pho██████████ |
| Email Address ███████████████ | Federal Tax ID Numbe ████████ |
| Name of Primary Authorized Signer: Ethan Jednat | |
| Name of Signer #2: | |
| Purchase Price: $150,000.00 | Purchased Amount: $194,999.76 |
| Purchased Percentage: 17.00% | Weeky Remittance: $5,416.66 |
| Weekly Remittance = (Monthly Average Sales x Purchased Percentage) /Average Weeks in a Calendar Month | |
| Processing Fee: $00.00 | |
| Designated Account Information [1] | |

| Bank: Chase | Account No.: ███████ | Routing No.: ███████ |
|---|---|---|

| Please initial this document here: _EJ_ | |
|---|---|

[1]   The term "Designated Account" means a transactional account maintained by Seller at a federally insured financial institution identified as the initial Designated Account by the execution of Attachment B ("Authorization Agreement for Direct Deposits (ACH Credit) and Direct Payments (ACH Debit)") hereto, which is incorporated herein and made a part of this Agreement, and any other depository account maintained by Seller, wherever located, which is subsequently identified by Seller as a Designated Account.

**This Agreement for the Purchase and Sale of Future Receivables (the "Agreement") as dated above ("Effective Date"), is made between National Funding, Inc. (together with its successors and/or assigns, the "Purchaser") and the merchant set forth above (the "Seller").**

WHEREAS, Purchaser, in its ordinary course of business, provides merchant funding through the purchase of future receivables, underwritten in accordance with Purchaser's underwriting standards and subject to such terms and conditions as are set forth in this Agreement; and

WHEREAS, Seller wishes to sell, assign and transfer without recourse (except to the extent provided herein), and the Purchaser wishes to purchase, for the purchase price set out above, a specified percentage of the future receivables of the Seller, having a value in the amount set out above.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and promises herein contained and intending to be legally bound, Purchaser and Seller agree as follows:

1.   **PURCHASE AND SALE TRANSACTION**

1.1 <u>Sale; Amount Sold; Purchase Price</u>. Seller hereby sells to Purchaser all of Seller's right, title and interest in a finite amount of Seller's Future Receivables, as defined herein, the dollar value of which is $194,999.76 (the "Purchased Amount"), in exchange for the purchase price of $150,000.00 (the "Purchase Price").

1.2 <u>Intent of the Parties; Transaction Not a Loan</u>. Seller and Purchaser agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from the Purchaser to the Seller. Seller agrees that the Purchase Price received in exchange for Seller's right, title and interest in the Purchased Amount pursuant to this Agreement equals the fair market value of such interests. Purchaser has purchased and shall own all of Seller's right, title and interest in 17.00% of Seller's Future Receivables (the "Purchased Percentage") up to the full Purchased Amount as Seller's Future Receivables are created. It is further the intent of the Parties that this purchase and sale transaction shall constitute a sale of accounts as such term is used in Article 9 of the Uniform Commercial Code, and that such purchase and sale shall provide the Purchaser with the full benefits of ownership of the purchased Future Receivables. It is agreed and acknowledged by the Parties that this purchase and sale transaction has no predetermined repayment term and that the remedies available to Purchaser are those available as a Party to this Agreement for breach of this Agreement and those available as the rightful owner of the Purchased Amount of Seller's Future Receivables. Further, if Seller's business declines, if Seller files for bankruptcy relief, or if Seller's business enterprise closes in due course, other than as the result of a breach of this Agreement or deliberate acts or omissions by the Seller to frustrate performance of the terms of this Agreement, Seller will not, as a result of such decline, bankruptcy filing, or closing, be in default under this Agreement.

1.3 <u>Future Receivables Defined</u>. When used anywhere in this Agreement, the term "Future Receivables" means: all payments of monies received by Seller in satisfaction of amounts owed to Seller in connection with or in satisfaction of Seller's accounts, future accounts, contract rights, and any other financial obligations owed to Seller in the ordinary course of business.

1.4 <u>No Right of Repurchase; No Recourse</u>. The purchase and sale transaction contemplated in this Agreement is made without recourse and constitutes a true sale of the purchased Future Receivables. Seller shall have no right to repurchase, pledge or resell the purchased Future Receivables. Seller shall have no obligation to make remittance except from the proceeds of Seller's Future Receivables.

1.5 <u>Reliance on Representations and Warranties</u>. Purchaser is entering this Agreement knowing the risks that the business enterprise of Seller may decline or fail. Purchaser assumes these risks based on and acting in reliance on Seller's representations, warranties, and covenants in this Agreement, which are intended to give Purchaser a reasonable and fair opportunity to receive the benefit of its bargain.

1.6 <u>Authorization to File Financing Statements</u>. Seller acknowledges that it is selling its Future Receivables to Purchaser, and as such, hereby authorizes Purchaser to file a financing statement pursuant to the Uniform Commercial Code ("UCC") to evidence such sale. The UCC financing statement may state that the sale of the Future Receivables is intended to be a sale and not an assignment for security. Seller agrees to execute any documents or take any action in connection with this Agreement that Purchaser deems necessary to perfect or maintain Purchaser's interest in the Future Receivables purchased pursuant to this Agreement.

1.7 <u>Date of Purchase; Disbursement of Funds</u>. Seller and Purchaser hereby agree that the Purchaser may purchase the purchased future receivables on a date not less than one (1) business day nor more than ten (10) business days after the Effective Date (the "Purchase Period"), at Purchaser's sole discretion. Seller and Purchaser further

agree that Purchaser, at any time during the Purchase Period, may at its sole discretion, purchase or refuse to purchase Seller's Future Receivables that are the subject of this Agreement for any or no reason. Seller and Purchaser further agree that Purchaser shall provide payment of the Purchase Price through any commercially reasonable method, at the Purchaser's sole discretion, including, but not limited to, check, federal funds wire, or ACH transfer. Seller hereby authorizes Purchaser to disburse funds in the amount of the Purchase Price, less applicable fees and charges, if any, by initiating an ACH credit into the Designated Account, as defined on the first page of this Agreement.

## 2. REMITTANCE OF PURCHASED AMOUNT / ACH AUTHORIZATIONS

2.1     <u>Remittance of Purchased Amount</u>. Seller hereby agrees to remit to Purchaser the U.S. dollars equivalent to the Purchased Percentage of Seller's Future Receivables (the "Remittance," as further defined below) on each calendar day except Saturday and Sunday, at the frequency provided for on the cover of this Agreement, until such time as the Purchased Amount has been delivered. If remittances are being made daily, Seller understands and acknowledges that this may result in two such remittances occurring on a calendar day following a holiday on which Seller's financial institution is not open for business.

2.2     <u>Calculation of Remittances</u>. Purchaser shall calculate a dollar amount to be remitted by Seller, which amount shall be calculated to be the equivalent, or a good-faith approximation thereof, of the Purchased Percentage of Seller's Future Receivables, in accordance with the rights of the Purchaser in such Future Receivables, based on the financial information supplied to the Purchaser by the Seller (the "Remittance"). As of the date of this Agreement and throughout the life of the Agreement, unless modified pursuant to Section 2.3 below, the Remittance shall be $5,416.66                (the "Initial Remittance"). By executing this Agreement, Seller hereby acknowledges that the dollar amount of the Initial Remittance, set forth above, accurately represents the Purchased Percentage of Seller's Future Receivables as of the Effective Date. The Initial Remittance shall remain in effect for each succeeding one (1) month period, unless and until a recalculation of the Remittance for any succeeding period is requested by the Seller or Purchaser.

2.3     <u>Reconciliation of Remittances</u>. Seller agrees that it is impossible for Purchaser to know the exact amount of Seller's Future Receivables in any given calendar month without first obtaining such information from Seller. At any time prior to Seller's remittance of the full Purchased Amount, either Seller or Purchaser may give written notice to the other party requesting a reconciliation to determine whether Purchaser received an amount greater or less than the Purchased Percentage of Seller's Future Receivables. Any written request made under this section must be made by the 30th day of the following month and shall be sent as to the following email address: (a) to Purchaser reconciliation@nationalfunding.com; to Seller ethan.jednat@precisiontradesllc.com        (the "Reconciliation Notice"). Seller shall either provide Purchaser with online access to its Designated Account or, at Purchaser's request, provide bank statements showing the activity related to the Designated Account for the previous two (2) months (the "Reconciliation Period") within five (5) days after sending or Receiving any Reconciliation Notice. If Seller does not provide a timely Reconciliation Notice or does not provide access to the Designated Account within the time frame provided, Seller will have waived its rights to any Monthly Reconciliation for that calendar month.

2.3.1     Change to the Remittance: Within five days of Purchaser's reasonable verification of Seller's Future Receivables actually generated during the Reconciliation Period, Purchaser shall adjust the Remittance on a going-forward basis to more closely reflect the Seller's actual Future Receivables times the Purchased Percentage. Purchaser will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Remittance until any subsequent adjustment.

2.3.2     Reconciliation Waiver: If Seller does not provide a timely Reconciliation Notice or does not provide access to the Designated Account within the time frame provided, Seller will have waived its rights to any reconciliation under section 2.3 for that calendar month.

2.3.3     Reconciliation Reset:  If at any time during the performance of this Agreement, Purchaser provides Seller with a Reconciliation Notice in conformity with the procedure outlined herein and Seller fails to provide Purchaser with either access to or bank statements from the Designated Account within five (5) days of the Reconciliation Notice, Purchaser has the right to reset the Remittance to the Initial Remittance amount.

2.4     <u>ACH Authorization</u>. Seller hereby authorizes Purchaser to initiate electronic debit or credit entries through the Automated Clearing House ("ACH") system to the Designated Account or any other depository account maintained by the Seller wherever located in the amount of the then effective Remittance, as well as any applicable fees or charges owing under this Agreement. Seller will give the Purchaser at least five (5) business days prior notice if it intends to change the Designated Account or add an additional Designated Account and will at that time submit an Authorization Agreement for Direct Deposits (ACH Credit) and Direct Payments (ACH Debit) in the form of

Attachment B hereto with reference to such newly established Designated Account.

2.5 <u>Default Authorization.</u> In the event of a Default of Seller's obligations under this Agreement, as set forth in Section 4.1 of this Agreement, Seller hereby authorizes Purchaser to initiate one or more ACH debit entries to the Designated Account or any other depository account maintained by the Seller wherever located in the amount of any portion of the Purchased Amount that was not remitted to Purchaser prior to the initiation of such debit entries, as well as any other amounts due and owing pursuant to the default provisions set forth in Sections 4.1, 4.2 and 4.3 of this Agreement. Further, Seller hereby authorizes any and all financial institutions at which the Designated Account or any other depository account is maintained by the Seller to accept each such ACH debit entry and to charge each such ACH debit entry initiated by Purchaser to any such account maintained by Seller. Seller understands and acknowledges that the default authorization contained in this Section 2.5 is a fundamental condition to induce Purchaser to enter into this Agreement. Consequently, such default authorization is intended to be irrevocable. If Seller terminates this default authorization or takes any action to impede or prevent the transaction(s) contemplated hereby, such termination or action shall, of itself, be an Event of Default, under Section 4.1 of this Agreement.

**3. REPRESENTATIONS, WARRANTIES AND COVENANTS**

3.1 <u>Representations, Warranties and Covenants of Seller.</u> Seller represents, warrants and covenants that as of the Effective Date of, and unless expressly stated otherwise during the course of, this Agreement: (i) the Future Receivables are freely assignable to Purchaser and are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever; (ii) Seller will not sell any Future Receivables to, or obtain a loan secured by any Future Receivables from, any other person or entity (an act commonly referred to as "stacking") without Purchaser's prior written consent; (iii) this Agreement does not violate the terms of any other agreement to which Seller is subject (including but not limited to any other sale of future receipts agreement, any loan agreement, organizational documents, etc.); (iv) Seller will not take any action to discourage, or prevent the deposit of all Future Receivables into the Designated Account; (v) Seller will not deposit funds arising from Future Receivables into a bank account other than the Designated Account without Purchaser's prior written consent; (vi) Seller will not block Purchaser from, and will provide Purchaser with full access to, the Designated Account; (vii) Seller will provide Purchaser legible, complete and unredacted copies of all statements from Seller's banks, credit card processors and other recipients of Seller's receivables within five (5) days of a request by Purchaser; (viii) Seller will permit Purchaser to conduct a site inspection of Seller's business, including an inspection of Seller's credit card terminals, at any reasonable time during the term of this Agreement with or without notice to Seller; (ix) because Purchaser has entered into this Agreement based on the current operations of Seller, Seller will not undertake any transaction involving the sale of Seller, either by an issuance, sale or transfer of ownership interests in Seller that results in a change in ownership or voting control of Seller, or by a sale or transfer of substantially all of the assets of Seller, without prior written consent of Purchaser; (x) Seller will not conduct business under any name other than as disclosed herein or change the location of its business without prior written notice to Purchaser; (xi) Seller will not voluntarily permit another person or company, including without limitation a franchisor company (if Seller is a franchisee), to assume or take over the operation and/or control of Seller's business or business locations without prior written consent of Purchaser; (xii) all information provided by Seller to Purchaser in this Agreement, Seller's application, Seller's interview with Purchaser or otherwise, and all of Seller's financial statements and other financial documents provided to Purchaser, are true, correct, complete and accurately reflect Seller's financial condition and results of operations at the time such information and materials were provided to Purchaser; (xiii) Seller is in compliance with all laws applicable to Seller's business and has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes; (xiv) as of the Effective Date of this Agreement, Seller is not contemplating the filing of a bankruptcy proceeding, closing Seller's business, winding down Seller's business operations, or selling Seller's business, and has no reason to believe that a bankruptcy petition or other proceeding will be filed or brought against it; (xv) Seller will use the Purchase Amount solely for legal business purposes and will not use the Purchase Amount for personal, family or household purposes; and (xvi) Seller has full power and authority to enter into and perform the obligations under this Agreement.

3.2 <u>Representations, Warranties and Covenants of Purchaser.</u> Purchaser hereby represents, warrants and covenants that at all times, for so long as any portion of the Purchased Amount remains outstanding: (i) Purchaser is a company organized, validly formed and existing and in good standing in the jurisdiction of its formation; (ii) the execution, delivery and performance of this Agreement by Purchaser has been validly authorized by all necessary corporate action on its part and will not contravene any provision of its articles of association, corporate charter, by-

laws, shareholders agreement or other governing documents; and (iii) this Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency or other similar laws affecting creditors' rights and to general principles of equity (whether considered in a proceeding in equity or at law).

3.3 <u>Representations, Warranties and Covenants of Seller Regarding the Nature of the Transaction</u>. In addition to those representations, warranties and covenants set forth above, Seller hereby further represents, warrants and covenants that as of the time that it entered this Agreement, Seller understands and acknowledges that the purchase and sale transaction contemplated by this Agreement is not a loan and that Laws governing the rights and remedies of parties to a loan transaction, including Laws governing or restricting the interest that may be charged in connection with such a loan transaction, do not apply to the purchase and sale transaction that is being entered into by the Parties.

3.4 <u>Inspection of Seller's Place of Business</u>. Purchaser and Purchaser's designated representatives and agents shall have the right during Seller's normal business hours and at any other reasonable time to examine the interior and exterior of any Seller's place of business. During an examination of any Seller's place of business, Purchaser may examine, among other things, whether Seller (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Seller's business and (iv) has one or more credit card terminals if Seller processes credit card transactions. When performing an examination, Purchaser may photograph the interior and exterior of any Seller place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Purchaser that he or she does not authorize Purchaser to photograph the Signatory.

3.5 <u>Continuing Nature of Representations, Warranties and Covenants</u>. Unless expressly stated otherwise, each and all of the foregoing representations shall be deemed to be continuing covenants and shall remain true and accurate at all times after the Effective Date, until the Purchased Amount has been remitted in full.

## 4. DEFAULT / REMEDIES UPON DEFAULT

4.1 <u>Events of Default</u>. Seller shall be in default of this Agreement should any of the following occur: (i) Seller makes any material misrepresentation hereunder or breaches, in any way, whether by act or omission, any representation, warranty, covenant, promise, or agreement in this Agreement; (ii) Seller instructs its bank or other depository financial institution to stop payment on any authorized ACH withdrawal initiated by Purchaser; (iii) Seller obstructs Purchaser's access to information for the Designated Account or fails to provide to Purchaser copies of all documents related to Seller's banking and financial affairs within five (5) days of receipt of Purchaser's request for such documents; (iv) Seller applies for, or agrees to, any merchant cash advance or any form of financing without the prior, written consent of Purchaser; (v) Seller voluntarily sells any assets, including receivable or Future Receivables, outside the normal course of business without Purchaser's prior, written consent; (vi) Seller voluntarily subjects Seller's Future Receivables to any claim, charge, lien, restriction, encumbrance or security interest; (vii) Seller redirects the deposit of Future Receivables away from any Designated Account without the prior, written consent of Purchaser; (viii) Seller fails to give the Purchaser at least five (5) business days prior notice before changing the Designated Account or adding an additional Designated Account and/or fails to submit an ACH CREDIT/DEBIT AUTHORIZATION in the form of Attachment B hereto with reference to such newly established Designated Account; (ix) Seller, by act or omission, directly or indirectly, with an intent to avoid its obligations under this Agreement, obstructs, hinders, or interferes with the remittance of the Purchased Amount or the remittance of any Remittance then in effect; (x) Seller takes any action to discourage the use of any electronic payment cards or causes any event to occur that may have an adverse effect on the use, acceptance or authorization of electronic payment cards for the purchase of Seller's products and/or services, or cause a diversion of Seller's Future Receivables, without the express, prior written consent of Purchaser; (xi) Seller uses the proceeds of the purchase and sale transaction contemplated by this Agreement for personal, family or household expenses or purposes; (xii) Seller conducts its business under any name, or through any entity, other than the entity that is a Party to this Agreement and is identified hereunder, changes its business location(s), or closes its business for renovations or for any other purpose without the express, prior written consent of Purchaser. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Purchaser ten business days' notice to the extent practicable; (xiii) Seller voluntarily undertakes any transaction involving the sale of any part of Seller's business or inventory, other than in the ordinary course of business, without the express, prior written consent of Purchaser; (xiv) Seller willingly forfeits control of its business without the express, prior written consent of Purchaser; (xv) Seller knowingly provides false or

fraudulent information to Purchaser; (xvi) Seller fails to operate its business in compliance with all applicable statutes, rules, ordinances, regulations, final court decisions or other laws governing the business of Seller and fails to obtain or maintain the permits, licenses, and approvals that are necessary to conduct Seller's business; (xvii) Seller fails to pay all applicable local, state and federal taxes and fees; (xviii) Seller fails to sign all documents that Purchaser deems necessary for performance of the Parties pursuant to this Agreement and the actions contemplated hereby; (xix) Seller fails to allow Purchaser to inspect, audit, check and make copies of any or all of the books, records, journals, orders, receipts, and correspondence relating to Seller's accounts or other transactions between the parties to or on such accounts and the general financial condition of Seller; (xx) Seller fails to permit Purchaser or its agent to conduct site inspections of Seller's business, in accordance with this Agreement; (xxi) Seller without the prior, written consent of the Purchaser, (a) grants any extension of time for payment of any of the Purchased Amount of Seller's Future Receivables, (b) compromises, writes-down, writes-off or otherwise settles any of the Purchased Amount of Seller's Future Receivables, releases any debtor or account associated with the Purchased Amount of Seller's Future Receivables, or grants any credits, offsets, reductions, return authorizations or the like with respect to the Purchased Amount of Seller's Future Receivables without the prior written consent of Purchaser; or (xxii) Seller voluntarily enters into any transaction, such as the sale, assignment, pledge or alienation, in any form, of ownership interests or assets, that could result in a change of control of Seller or devaluation of Seller, without the prior written consent of Purchaser.

       4.2    <u>Remedies upon Events of Default.</u> Upon the occurrence of any Event of Default enumerated in Section 4.1, above: (i) Purchaser shall be immediately entitled to collect from Seller the remaining undelivered balance of the Purchased Amount; (ii) Purchaser may exercise any and all remedies available to secured creditors under the Uniform Commercial Code; (iii) Purchaser may elect to rescind the Agreement in its entirety; (iv) Purchaser shall be entitled to any and all costs, including reasonable attorney's fees, in connection with its defense, protection, or enforcement of its rights under this Agreement, and (v) Purchaser will otherwise be entitled to any and all remedies available to it under Law or at equity.

       4.3    <u>Remedies Not Exclusive</u>.  Subject to arbitration as provided in Section 5.3, the remedies provided under this Agreement are cumulative and not exclusive of any remedies provided by law or equity.

       4.4    <u>Waiver</u>. Subject to arbitration as provided in Section 5.3, the failure of Purchaser to exercise or delay in exercising any right under this Agreement shall not constitute a waiver of such right or preclude Purchaser from exercising such right at a later time. The singular or partial exercise of any right under this Agreement shall not preclude Purchaser from any future exercise of that or any other right.

       4.5    <u>Personal Guaranty</u>. Seller, as an inducement to Purchaser to enter this Agreement, shall cause a personal Performance Guaranty be executed by one or more persons owning, individually or a combined, fifty percent (50%) or more interest in Seller ("Principal(s)") in Seller in the form of Attachment A ("Personal Performance Guaranty") hereto, which, when each such required Guaranty is fully executed is incorporated herein and made a part of this Agreement.

       4.6    <u>Attorneys' Fees and Collection Costs</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, or if commenced based on a breach or any other action arising from the Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## 5.    DISPUTE RESOLUTION

       5.1    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement will be exclusively governed by such laws. Seller understands and agrees that (i) Purchaser is located in California, (ii) Purchaser makes all decisions to purchase from Purchaser's office in California, (iii) the Agreement is made in California (that is, no binding contract will be formed until Purchaser receives and accepts Seller's signed Agreement in California) (iv) the Purchase Price is distributed from California  (v) Seller's remittances are not accepted until received by Purchaser in California; and, therefore, (vi) the Agreement has a sufficient and tangible nexus to California.

       5.2    <u>Jurisdiction and Venue</u>. Purchaser and Seller agree that this Agreement is being executed and delivered in the State of California and that any action or proceeding to enforce or arising out of this Agreement shall be commenced in any court of the State of California or in the United States District Court for the Southern District of California, and Seller waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court will be properly served and confer personal jurisdiction if served by registered or certified mail to Seller, or as otherwise provided by the laws of the State of California or the United States of

America. Purchaser and Seller agree that venue is proper in such courts.

      5.3    <u>ARBITRATION</u>. IF PURCHASER, SELLER OR ANY GUARANTOR (AS DEFINED IN ATTACHMENT A) REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF PURCHASER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF PURCHASER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, PURCHASER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). PURCHASER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, PURCHASER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, PURCHASER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN PURCHASER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. PURCHASER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. PURCHASER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

      5.4    <u>RIGHT TO OPT OUT OF ARBITRATION</u>. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: NATIONAL FUNDING, INC., 9530 TOWNE CENTRE DR., SUITE 120, SAN DIEGO, CA 92121 ATTENTION: LEGAL DEPARTMENT.

      5.5    <u>Class Action Waiver</u>. The parties waive any right to assert any claims against the other party as a representative or member in any class or representative action, except where such waiver is prohibited by law against public policy. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (not withstanding any other provision in this agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. For purposes of clarity, the limitations in this section, shall not apply to the costs associated with defending the class or representative action.

**6.    TERM / TERMINATION**

      6.1    <u>Term</u>. The Parties to this Agreement agree and acknowledge that this Agreement has no set term and shall remain in effect until the Purchased Amount has been remitted in full.

**7.    MISCELLANEOUS**

7.1     Entire Agreement. This Agreement contains the entire understanding of the Parties hereto and supersedes all prior negotiations, whether oral or written.

7.2     Binding Effect / Assignment. This Agreement shall be binding upon and inure to the benefit of Seller, Purchaser and their respective successors and assigns, except that Seller shall not have the right to assign its rights or obligations or any interest in this Agreement without the prior written consent of the Purchaser, which consent may be withheld in the Purchaser's sole discretion. Any unauthorized assignment by Seller shall be null and void. Purchaser may without the consent of Seller and upon notice to Seller, sell and assign all or any portion of all of the rights and obligations or duties of Seller under this Agreement (an "Assignment"). From and after the effective date of any Assignment, this Agreement shall be deemed amended and modified (without the need for any further action on the part of either party) such that the assignee shall be deemed a party to this Agreement and, to the extent provided in the Assignment, have the rights and obligations of the Purchaser under this Agreement associated with the Assignment, including but not limited to rights to Purchaser's receipt of security to secure Seller's performance under this Agreement, rights to receive a guarantee from Seller regarding the full and prompt performance of every Purchased Future Receivable under this Agreement and Purchaser's right to declare a default or an event of default under this Agreement and to receive damages from Seller following a breach of this Agreement by Seller. Notwithstanding the foregoing, unless otherwise notified in writing by any such assignee, Seller shall not be required to take any action for the direct benefit of an assignee following such Assignment and its obligations under this Agreement shall not be altered thereby. In connection with such assignment, Purchaser may disclose all information that it has relating to Seller or its business.

7.3     Assumption of Risk. Purchaser is purchasing the Future Receivables and Purchaser assumes the risk that Seller's business may fail or be adversely affected by conditions outside the control of Seller provided Seller has not breached a representation, warranty or covenant set forth in this Agreement.  Because this Agreement is not a loan, if Seller's business slows down and Seller's Future Receivables decrease or if Seller closes its business and Seller has not violated any of the representations, warranties and covenants in this Agreement, there shall be no default or breach of this Agreement.

7.4     Severability. Should any term or provision of this Agreement be deemed invalid, illegal or unenforceable, then such invalid, illegal or unenforceable term or provision shall be null and void, and all other terms and provisions of this Agreement shall continue in full force and effect as though such invalid, illegal or unenforceable term or provision had never been a part hereof.

7.5     Fees. Fees and charges associated with this purchase and sale transaction, including a one-time Processing Fee, are as follows.  Unless otherwise specified herein, any remittances received from Seller will be first applied to any assessed fees before being applied as a remittance of the Purchased Amount:

7.5.1   Processing Fee: Seller agrees to pay Purchaser the Processing Fee listed on the cover page of this Agreement to reimburse Purchaser for expenses incurred in processing Seller's receivables, filing and terminating UCC financing statement(s), and paying fees (if applicable) to any other persons for referring Seller to Purchaser and assisting with the sale of the Future Receivables. The Processing Fee shall be fully earned and will be deducted from the Purchase Price being deposited and paid to Seller.

7.5.2   Bank Wire Fee: Seller may request to receive payment of the net Purchase Price by wire transfer. Purchaser shall have sole discretion in determining whether it will agree to pay the net Purchase Price by wire transfer. In the event Purchaser pays the Purchase Price by wire transfer, Seller agrees to pay Purchaser a fee of $25, which covers the administrative, technological and banking costs for paying the Purchase Price by wire transfer. Purchaser will deduct the amount of the Bank Wire Fee from the Purchase Price that is to be paid to Seller.

7.5.3   Returned Item Fee. Seller agrees to pay Purchaser promptly upon demand a returned item fee of $35 (a "Returned Item Fee") if an electronic debit is returned unpaid or cannot be processed, or if a check, draft or similar instrument issued by Seller or any individual that signs this Agreement is not honored or cannot be processed (either of which is a "Returned Item Event"). At Purchaser's option, Purchaser will assess this fee any time a remittance is not honored or paid, even if it is later honored or paid following resubmission. Seller and any individual that signs this Agreement authorizes Purchaser to resubmit returned debits in its discretion.

7.5.4   Stacking Fee. Seller agrees to pay Purchaser promptly upon demand a Stacking Fee that is the greater of $2,000 or 15% of the undelivered Purchased Amount as of the date Purchaser learns that Seller sold its Future Receivables or obtained a loan secured by any Future Receivables (either of which is a "Stacking Event"). Stacking also constitutes a breach of this Agreement as specified in Sections 3.1 and 4.1.

7.6     Further Assurances. Seller agrees, from time to time, upon the Purchaser's request, to perform such further acts and to make, execute, acknowledge, and deliver to the Purchaser such further and additional instruments,

documents, and agreements, and to take such further action as may be required to carry out the intent and purpose of this Agreement.

7.7     Interpretation. This Agreement shall be construed as if drafted jointly by the Parties and no presumption of burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any pronoun shall include the corresponding masculine, feminine and neuter forms.

7.8     Counterparts; Digital, Electronic and Fax Signatures. This Agreement may be executed in one or more counterparts, each of which counterparts will be deemed to be an original, and all such counterparts will constitute one and the same instrument. For purposes of the execution of this Agreement and any other related documents, Seller agrees that an electronic signature has the same legal and morale effect as if Seller signed such Agreements and documents in ink and will be deemed valid, authentic, enforceable and binding and that such electronically signed documents shall be deemed originals.

7.9     Notices. Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, or first-class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Seller will be sent to Seller's last known address in Purchaser's records. Notice to Purchaser may be sent to National Funding, Inc., 9530 Towne Centre Drive, Suite 120, San Diego, CA 92121.

7.10     Customer Service Contact Information. If you have questions or comments about this Agreement, you may contact National Funding at 888-733-2383 or by mail at: National Funding, Inc., c/o Customer Service, 9530 Towne Centre Drive, San Diego, CA 92121.

7.11     TCPA Consent & Privacy. Notwithstanding any current or prior election to opt in or opt out of receiving telemarketing calls or SMS messages (including text messages) from us, our agents, representatives, affiliates, or anyone calling on our behalf, you expressly consent to be contacted by us, our agents, representatives, affiliates, or anyone calling on our behalf for any and all purposes arising out of or relating to the Agreement and/or account, at any telephone number, or physical or electronic address you provide or at which you may be reached. You agree we may contact you in any way, including SMS messages (including text messages), or an automatic texting system. In the event that an agent or representative calls, he or she may also leave a message on your answering machine, voice mail, or send one via text. You consent to receive SMS messages (including text messages), calls and messages from us, our agents, representatives, affiliates calling on our behalf at the specific number(s) you have provided to us, or numbers we can reasonably associate with your account, with information or questions about the Agreement and/or account. You represent that you are permitted to receive calls at each of the telephone numbers you have provided to us. You agree to promptly alert us whenever you stop using a particular telephone number. You also agree that we may contact you by e-mail, using any email address you have provided to us or that you provide to us in the future.

7.12     Modifications. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by Purchaser. This provision shall survive, in its entirety, the delivery of the Future Receivables purchased and the termination of this Agreement.

## 8.     CERTIFICATION AND SIGNATURES

8.1     Seller: By signing below or authorizing the person signing below to sign on its behalf, Seller adopts and agrees to every provision without exception contained within this Agreement and further certifies that Seller has received a copy of this Agreement and that Seller has read, understood and agreed to be bound by its terms. Each person signing below certifies that each person is signing on behalf of Purchaser and Seller in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Parties. For purposes of the execution of this Agreement, electronic signatures and fax signatures shall be treated in all respects as original signatures.

**Seller:**

Signer #1:     *Ethan Jednat*
Ethan Jednat (Sep 15, 2023 16:07 EDT)

Signer #2: 

Name:     Ethan Jednat

Name: 

Title:     Member

Title:

8.2 <u>Purchaser</u>: The obligation of Purchaser under this Agreement will not be effective unless and until Purchaser has completed its review of the Seller and has accepted this Agreement at its offices in California by paying the Purchase Price, less applicable fees and charges, if any

**National Funding, Inc.:**

X: *Sandra Otero*
Sandra Otero (Sep 15, 2023 13:19 PDT)

Name: Sandra Otero

Title: Chief Credit Officer

**ATTACHMENT A**
**PERSONAL PERFORMANCE GUARANTY**

This Personal Performance Guaranty ("**Guaranty**") is made on 09/15/2023        by  Ethan Jednat
          (the "**Guarantor**"), in favor of National Funding, Inc. (the "Purchaser") to induce the Purchaser to purchase certain future receivables from  Precision Trades & Services LLC             (the "Seller"), pursuant to the Agreement for the Purchase and Sale of Future Receivables (the "Agreement") by and between Seller and Purchaser on 09/15/2023         . Guarantor is a Principal of the Seller, as defined in Section 4.5 of the Agreement. Guarantor has determined that executing and delivering this Guaranty is in Guarantor's interest and to Guarantor's financial benefit.

**1.     GUARANTY**
        1.1     <u>Scope</u>. Guarantor hereby absolutely, irrevocably and unconditionally guarantees to the Purchaser the following (collectively, the "Obligations"): (i) the Future Receivables of Seller are freely assignable to Purchaser and are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever; (ii) Seller will not sell any Future Receivables to, or obtain a loan secured by any Future Receivables from, any other person or entity (an act commonly referred to as "stacking") without Purchaser's prior written consent; (iii) this Agreement does not violate the terms of any other agreement to which Seller is subject (including but not limited to any other sale of future receipts agreement, any loan agreement, organizational documents, etc.); (iv) Seller will not take any action to reduce, discourage, or prevent the deposit of all Future Receivables into the Designated Account; (v) Seller will not deposit funds arising from Future Receivables into a bank account other than the Designated Account without Purchaser's prior written consent; (vi) Seller will not block Purchaser from, and will provide Purchaser with full access to, the Designated Account; (vii) Seller will provide Purchaser legible, complete and unredacted copies of all statements from Seller's banks, credit card processors and other recipients of Seller's receivables within five (5) days of a request by Purchaser; (viii) Seller will permit Purchaser to conduct a site inspection of Seller's business, including an inspection of Seller's credit card terminals, at any reasonable time during the term of this Agreement with or without notice to Seller; (ix) because Purchaser has entered into this Agreement based on the current operations of Seller, Seller will not undertake any transaction involving the sale of Seller, either by an issuance, sale or transfer of ownership interests in Seller that results in a change in ownership or voting control of Seller, or by a sale or transfer of substantially all of the assets of Seller, without prior written consent of Purchaser; (x) Seller will not conduct business under any name other than as disclosed herein or change the location of its business without prior written notice to Purchaser; (xi) Seller will not voluntarily permit another person or company, including without limitation a franchisor company (if Seller is a franchisee), to assume or take over the operation and/or control of Seller's business or business locations without prior written consent of Purchaser; (xii) all information provided by Seller to Purchaser in this Agreement, Seller's application, Seller's interview with Purchaser or otherwise, and all of Seller's financial statements and other financial documents provided to Purchaser, are true, correct, complete and accurately reflect Seller's financial condition and results of operations at the time such information and materials were provided to Purchaser; (xiii) Seller is in compliance with all laws applicable to Seller's business and has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes; (xiv) as of the Effective Date of this Agreement, Seller is not contemplating the filing of a bankruptcy proceeding, closing Seller's business, winding down Seller's business operations, or selling Seller's business, and has no reason to believe that a bankruptcy petition or other proceeding will be filed or brought against it; (xv) Seller will use the Purchase Amount solely for legal business purposes and will not use the Purchase Amount for personal, family or household purposes; and (xvi) Seller has full power and authority to enter into and perform the obligations under this Agreement.
        1.2     <u>Not a Guarantee of Payment</u>.  By way of clarification, this performance guaranty is not an unconditional guaranty of repayment. As provided in Section 1.2 of the Agreement, if Seller's business declines, seeks bankruptcy relief, or if Seller's business enterprise closes in due course, other than as the result of a breach of this Agreement or deliberate acts or omissions by the Seller to frustrate performance of the terms of this Agreement, Seller will not, as a result of such decline or closing, be in default under this Agreement.
**2.     DURATION OF GUARANTY; CONTINUING OBLIGATIONS**
This is a continuing Guaranty and shall not be revoked by the death, dissolution, merger, of the Guarantor. This Guaranty shall remain in full force and effect with respect to the Guarantor until the Obligations are fulfilled.

**3.      CONTINUATION OF LIABILITY**

The Obligations of Guarantor will in no way be affected, impaired, diminished or released by any action or inaction whatsoever other than the fulfillment of such Obligations.

**4.      UNCONDITIONAL WAIVER OF ALL DEFENSES**

Guarantor waives all demands, protests, presentments, and notices of every kind or nature, including notices of protest, dishonor, nonpayment, default, and/or acceptance of this Guaranty, and the creation, renewal, extension, or modification of any Obligations. Guarantor has had a full and adequate opportunity to review the Agreement, the transaction that such documents contemplate, Seller's Receivables, Seller's ability to perform the Obligations, and all related facts. Guarantor shall at all times keep itself fully informed on all such matters. Purchaser has no duty, at any time, to disclose to Guarantor any information about any such matters. If Purchaser in its discretion provides any such information, this does not obligate Purchaser to provide any further information.

**5.      IMMEDIATE RECOURSE/EXERCISE OF RIGHTS BY THE PURCHASER**

At any time when any Obligation owing by Seller, is not fulfilled by Seller, Guarantor agrees to immediately fulfill such Obligation or remediate any harm caused to Purchaser thereby. No delay or stay in pursing any remedy available to Purchaser will be effective under this Guaranty, and Guarantor agrees to immediately fulfill Guarantor's Obligations, notwithstanding such delay or stay. All rights, powers and remedies of the Purchaser hereunder are cumulative and not alternative and shall be in addition to all rights, powers and remedies given to the Purchaser by law, under equitable principles and by the Agreement.

**6.      REPRESENTATIONS AND WARRANTIES**

Guarantor represents, warrants and covenants to the Purchaser that: (a) there are no pending or threatened legal proceedings or judgments against Guarantor, and no federal or state tax liens have been filed or threatened against Guarantor; and (b) Guarantor is not in default or claimed default under any agreement for borrowed money.

**7.      EXPENSES**

Guarantor agrees to pay all expenses (including attorneys' fees) incurred by the Purchaser in connection with the enforcement of the Purchaser's rights under this Guaranty.

**8.      ARBITRATION**

IF PURCHASER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF PURCHASER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF PURCHASER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, PURCHASER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). PURCHASER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, PURCHASER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, PURCHASER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN PURCHASER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. PURCHASER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. PURCHASER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND

BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**9**. **RIGHT TO OPT OUT OF ARBITRATION**

SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: NATIONAL FUNDING, INC., 9530 TOWNE CENTRE DR., SUITE 120, SAN DIEGO, CA 92121 ATTENTION: LEGAL DEPARTMENT.

**10.** **CLASS ACTION WAIVER**

The parties waive any right to assert any claims against the other party as a representative or member in any class or representative action, except where such waiver is prohibited by law against public policy. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (not withstanding any other provision in this agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. For purposes of clarity, the limitations in this section, shall not apply to the costs associated with defending the class or representative action.

**11. TCPA CONSENT & PRIVACY**. Notwithstanding any current or prior election to opt in or opt out of receiving telemarketing calls or SMS messages (including text messages) from us, our agents, representatives, affiliates, or anyone calling on our behalf, Guarantor expressly consents to be contacted by us, our agents, representatives, affiliates, or anyone calling on our behalf for any and all purposes arising out of or relating to the Agreement and/or the Seller's account, at any telephone number, or physical or electronic address you provide or at which you may be reached. Guarantor agrees we may contact you in any way, including SMS messages (including text messages), or an automatic texting system. In the event that an agent or representative calls, he or she may also leave a message on your answering machine, voice mail, or send one via text. Guarantor consents to receive SMS messages (including text messages), calls and messages from us, our agents, representatives, affiliates calling on our behalf at the specific number(s) you have provided to us, or numbers we can reasonably associate with the account, with information or questions about the Agreement and/or account. You represent that you are permitted to receive calls at each of the telephone numbers you have provided to us. You agree to promptly alert us whenever you stop using a particular telephone number. You also agree that we may contact you by e-mail, using any email address you have provided to us or that you provide to us in the future.

**12.** **ASSIGNABILITY/BINDING EFFECT**

This Guaranty shall be assignable by the Purchaser without notice to Guarantor and shall inure to the benefit of the Purchaser and to any subsequent successors and assigns. In the event of the death of Guarantor, this Guaranty shall continue in effect against the estate of Guarantor.

**13.** **SEVERABILITY**

If any provision of this Guaranty is in conflict with any statute or rule of law or is otherwise unenforceable for any reason, then that provision will be deemed null and void to the extent of the conflict or unenforceability and will be deemed severable, but it will not invalidate any other provision of this Guaranty.

**14.** **COMPLETE AGREEMENT**

This Guaranty is the final, complete and exclusive expression of the agreement between Guarantor and the Purchaser with respect to the subject matter of this Guaranty. This Guaranty cannot be modified or amended except in a writing signed by both Guarantor and the Purchaser.

**15.** **GOVERNING LAW, VENUE AND JURSIDICTION**

This Personal Guaranty will be exclusively construed in accordance with the laws of the State of California, and will inure to the benefit of Purchaser, its successors and assigns. This Guarantee and each guarantor hereby agree to consent to the exclusive and mandatory venue and jurisdiction of any court of the state of California for all matters or in the United States District Court for the Southern District of California. Guarantor agrees that any action or proceeding to

enforce or arising out of this Agreement or Guaranty will be exclusively commenced and litigated in any court of the State of California or in the United States District Court for the District of California.

**Signer #1:** *Ethan Jednat*
Ethan Jednat (Sep 15, 2023 16:07 EDT)

**Signer #2:** _____

Name: Ethan Jednat  Name: _____

**ATTACHMENT B**

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBIT)**

This Authorization Agreement for Direct Deposit (ACH Transfer Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Agreement for the Purchase and Sale of Future Receivables (the "Agreement") between Seller and National Funding, Inc. ("Purchaser"). Capitalized terms used and not otherwise defined herein will have same respective meanings given to such terms in the Agreement.

**DISBURSEMENTS.** By signing below, Seller authorizes Purchaser (and/or its successors and assigns) or its designee to disburse the net Purchase Price by initiating an ACH Credit to the checking account indicated below, the "Designated Account," in the amount set forth in the Agreement. This authorization is to remain in full force and effect until Purchaser has received written notification from Seller of its termination in such time and in such manner as to afford Purchaser and Seller's depository bank a reasonable opportunity to act on it.

**REMITTANCES.** By signing below, Seller agrees to enroll and authorizes Purchaser or its designee to collect remittances required under the terms of the Agreement by initiating ACH Debit entries to the Designated Account. Seller authorizes Purchaser or its designee to increase the amount of any scheduled ACH Debit entry or assess multiple ACH Debits for the amount of any previously scheduled remittance(s) that was not paid as provided for in the Agreement and any unpaid Fees. This authorization is to remain in full force and effect until Purchaser or its designee has received written notification from Seller of its termination in such time and in such manner as to afford Purchaser and Seller's bank a reasonable opportunity to act on it. Purchaser or its designee may suspend or terminate this authorization if Seller fails to keep Seller's Designated Account in good standing or if there are insufficient funds in Seller's Designated Account to process any remittance.

**PROVISIONAL PAYMENT**: Credit given by us to you with respect to an Automated Clearing House ("ACH") credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e. the originator of the entry) will not be deemed to have paid you in the amount of such entry.

**BUSINESS PURPOSE ACCOUNT.** By signing below, Borrower attests that the Designated Account was established for **business and commercial purposes only and not for personal, family or household purposes**.

**ACCOUNT CHANGES**. Seller agrees to notify Purchaser, promptly, in writing, if there are any changes to the account and routing numbers of the Designated Account. In the event that this account is deemed closed, insufficient or frozen, or a stop payment has been issued, and Purchaser obtains information that Seller maintains a different checking account, then Seller hereby authorizes Borrower, without notice or further permission, to replace that new account information on this form and begin immediate withdrawals based on the newly obtained account information.

Depository Name: ▮▮▮▮▮

Branch: _____ City: _____ State: _____ Zip: _____

Routing Number: ▮▮▮▮▮ Account Number: ▮▮▮▮▮

Print Business Name: Precision Trades & Services LLC  Fed Tax ID #: ▮▮▮▮▮

Signature: *Ethan Jednat*
Ethan Jednat (Sep 15, 2023 16:07 EDT)   Title: Member   Date: 09/15/2023

# ATTACHMENT C
# EARLY DELIVERY ADDENDUM

The Parties desire to modify certain terms of the Agreement. In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree and amend the Remittance Schedule set forth in the Agreement as follows:

1. <u>Early Delivery Program</u>. Purchaser will provide a discount to Seller for the early delivery ("Early Delivery") of the Future Receivables in full for the relevant calendar day period, in the amount set forth below in Section 2 ("Discounted Amount"), less the amount of any receivables delivered to the Purchaser prior to the Early Delivery date, plus any unpaid fees or charges. The Early Delivery period begins on the next calendar day following the date on which Purchaser distributed the Purchase Price to Seller. In the event that the Early Delivery expiration date falls on a weekend or federal holiday, the expiration date shall become the following business day. A business day shall be Monday through Friday excluding any federal holidays or any dates that Purchaser is closed for business. The Early Delivery amount must be received by Purchaser (i.e., the date Purchaser's bank receives negotiable funds from Seller) on or before the expiration date to receive the Early Delivery amount in Section 2. Except as provided in this Addendum, all terms and conditions of the Agreement shall remain in full force and effect.

2. <u>Schedule</u>

| Calendar Days After Funding | Discounted Amount |
|:---:|:---:|
| 1 - 30 | 11% Discount off the Purchased Amount |
| 31 - 60 | 9% Discount off the Purchased Amount |
| 61 - 90 | 7% Discount off the Purchased Amount |

At all times following the dates provided above, Purchaser is entitled to receive and Seller must deliver the entire Purchased Amount set forth on the cover of the Agreement

3. <u>Exclusions</u>. Seller shall have no right to exercise the Early Delivery option if: (i) the funds come from National Funding, a related entity, affiliate, assignee, or any another funding company in the form of a business loan or other purchase and sale of future receivables; (ii) there have been any delayed or missed remittances; or (iii) there has been a breach or default of the Agreement.

By their signatures below, the parties agree to be bound by this addendum.

Signer #1: _Ethan Jednat_
Ethan Jednat (Sep 15, 2023 16:07 EDT)

Signer #2: _____

Name: Ethan Jednat

Name: _____

National Funding, Inc.:

X: _Sandra Otero_
Sandra Otero (Sep 15, 2023 13:19 PDT)

By: Sandra Otero

Title: Chief Credit Officer

**OUTSTANDING BALANCE ADDENDUM TO**
**FUTURE RECEIVABLES PURCHASE AND SALE AGREEMENT**
**NO. <u>FWC681546A</u>**

The Parties desire to modify certain terms of the Future Receivables Purchase and Sale Agreement dated **09/15/2023**, by and between **Precision Trades & Services LLC** dba **Precision Trades & Services** as Seller, and **NATIONAL FUNDING, INC.** as Purchaser (the "Agreement"). In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree and amend the Agreement as follows:

**There is an outstanding balance due to the Seller at the time of purchase ("Outstanding Balance"). This "Outstanding Balance" will be satisfied in full by a portion of the Purchase Price as indicated on the Agreement. The difference between the Purchase Price as indicated in the Agreement and the Outstanding Balance will now be recognized as the 'Total Amount Remitted to Seller'.**

**The Outstanding Balance and the Total Amount Remitted to Seller will be confirmed during the final, recorded verbal verification call with an authorized representative of Purchaser.**

The Agreement will remain in full force and effect except as modified by this Addendum. This Addendum will be governed by and construed in accordance with the laws of the State of California without giving effect to the principles of conflicts of laws. This Addendum may be executed in counterparts, all of which together will constitute one and the same instrument. Facsimile and electronic signatures will be deemed to be original signatures and each party hereto may rely on a facsimile signature as an original for purposes of enforcing this Addendum.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

**Seller:** Precision Trades & Services LLC dba Precision Trades & Services

**By:** **X** _Ethan Jednat_
Ethan Jednat (Sep 15, 2023 16:33 EDT)

**Name:** Ethan Jednat

**Title:** Member

**Date:** September 15, 2023

# PERSONAL PERFORMANCE GUARANTY

This Personal Performance Guaranty ("**Guaranty**") is made on 09/15/2023 by Jacob Plank , (referred to herein both individually and collectively as "**Guarantor**"), in favor of National Funding, Inc. (the "Purchaser") to induce the Purchaser to purchase certain future receivables from Precision Trades & Services LLC (the "Seller"), pursuant to the Agreement for the Purchase and Sale of Future Receivables (the "Agreement") by and between Seller and Purchaser on 09/15/2023. Guarantor is a Principal of the Seller, as defined in Section 4.5 of the Agreement. Guarantor has determined that executing and delivering this Guaranty is in Guarantor's interest and to Guarantor's financial benefit.

## 1. GUARANTY

1.1 <u>Scope</u>. Guarantor hereby absolutely, irrevocably and unconditionally guarantees to the Purchaser the following (collectively, the "Obligations"): (i) the Future Receivables of Seller are freely assignable to Purchaser and are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever; (ii) Seller will not sell any Future Receivables to, or obtain a loan secured by any Future Receivables from, any other person or entity (an act commonly referred to as "stacking") without Purchaser's prior written consent; (iii) this Agreement does not violate the terms of any other agreement to which Seller is subject (including but not limited to any other sale of future receipts agreement, any loan agreement, organizational documents, etc.); (iv) Seller will not take any action to reduce, discourage, or prevent the deposit of all Future Receivables into the Designated Account; (v) Seller will not deposit funds arising from Future Receivables into a bank account other than the Designated Account without Purchaser's prior written consent; (vi) Seller will not block Purchaser from, and will provide Purchaser with full access to, the Designated Account; (vii) Seller will provide Purchaser legible, complete and unredacted copies of all statements from Seller's banks, credit card processors and other recipients of Seller's receivables within five (5) days of a request by Purchaser; (viii) Seller will permit Purchaser to conduct a site inspection of Seller's business, including an inspection of Seller's credit card terminals, at any reasonable time during the term of this Agreement with or without notice to Seller; (ix) because Purchaser has entered into this Agreement based on the current operations of Seller, Seller will not undertake any transaction involving the sale of Seller, either by an issuance, sale or transfer of ownership interests in Seller that results in a change in ownership or voting control of Seller, or by a sale or transfer of substantially all of the assets of Seller, without prior written consent of Purchaser; (x) Seller will not conduct business under any name other than as disclosed herein or change the location of its business without prior written notice to Purchaser; (xi) Seller will not voluntarily permit another person or company, including without limitation a franchisor company (if Seller is a franchisee), to assume or take over the operation and/or control of Seller's business or business locations without prior written consent of Purchaser; (xii) all information provided by Seller to Purchaser in this Agreement, Seller's application, Seller's interview with Purchaser or otherwise, and all of Seller's financial statements and other financial documents provided to Purchaser, are true, correct, complete and accurately reflect Seller's financial condition and results of operations at the time such information and materials were provided to Purchaser; (xiii) Seller is in compliance with all laws applicable to Seller's business and has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes,

including but not limited to employment, sales and use taxes; (xiv) as of the Effective Date of this Agreement, Seller is not contemplating the filing of a bankruptcy proceeding, closing Seller's business, winding down Seller's business operations, or selling Seller's business, and has no reason to believe that a bankruptcy petition or other proceeding will be filed or brought against it; (xv) Seller will use the Purchase Amount solely for legal business purposes and will not use the Purchase Amount for personal, family or household purposes; and (xvi) Seller has full power and authority to enter into and perform the obligations under this Agreement.

1.2     Not a Guarantee of Payment.  By way of clarification, this performance guaranty is not an unconditional guaranty of repayment. As provided in Section 1.2 of the Agreement, if Seller's business declines, seeks bankruptcy relief, or if Seller's business enterprise closes in due course, other than as the result of a breach of this Agreement or deliberate acts or omissions by the Seller to frustrate performance of the terms of this Agreement, Seller will not, as a result of such decline or closing, be in default under this Agreement.

## 2.  DURATION OF GUARANTY; CONTINUING OBLIGATIONS

This is a continuing Guaranty and shall not be revoked by the death, dissolution, merger, of the Guarantor. This Guaranty shall remain in full force and effect with respect to the Guarantor until the Obligations are fulfilled.

## 3.  CONTINUATION OF LIABILITY

The Obligations of Guarantor will in no way be affected, impaired, diminished or released by any action or inaction whatsoever other than the fulfillment of such Obligations.

## 4.  UNCONDITIONAL WAIVER OF ALL DEFENSES

Guarantor waives all demands, protests, presentments, and notices of every kind or nature, including notices of protest, dishonor, nonpayment, default, and/or acceptance of this Guaranty, and the creation, renewal, extension, or modification of any Obligations. Guarantor has had a full and adequate opportunity to review the Agreement, the transaction that such documents contemplate, Seller's Receivables, Seller's ability to perform the Obligations, and all related facts. Guarantor shall at all times keep itself fully informed on all such matters. Purchaser has no duty, at any time, to disclose to Guarantor any information about any such matters. If Purchaser in its discretion provides any such information, this does not obligate Purchaser to provide any further information.

## 5.  IMMEDIATE RECOURSE/EXERCISE OF RIGHTS BY THE PURCHASER

At any time when any Obligation owing by Seller, is not fulfilled by Seller, Guarantor agrees to immediately fulfill such Obligation or remediate any harm caused to Purchaser thereby. No delay or stay in pursing any remedy available to Purchaser will be effective under this Guaranty, and Guarantor agrees to immediately fulfill Guarantor's Obligations, notwithstanding such delay or stay. All rights, powers and remedies of the Purchaser hereunder are cumulative and not alternative and shall be in addition to all rights, powers and remedies given to the Purchaser by law, under equitable principles and by the Agreement.

## 6. EXPENSES

Guarantor agrees to pay all expenses (including attorneys' fees) incurred by the Purchaser in connection with the enforcement of the Purchaser's rights under this Guaranty.

## 7. ARBITRATION

IF PURCHASER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF PURCHASER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF PURCHASER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, PURCHASER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). PURCHASER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, PURCHASER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, PURCHASER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN PURCHASER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. PURCHASER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. PURCHASER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**8. RIGHT TO OPT OUT OF ARBITRATION**

SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: QUICK BRIDGE FUNDING, LLC, C/O NATIONAL FUNDING, INC., 9530 TOWNE CENTRE DR., SUITE 120, SAN DIEGO, CA 92121 ATTENTION: LEGAL DEPARTMENT.

**9. CLASS ACTION WAIVER**

The parties waive any right to assert any claims against the other party as a representative or member in any class or representative action, except where such waiver is prohibited by law against public policy. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (not withstanding any other provision in this Agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. For purposes of clarity, the limitations in this section, shall not apply to the costs associated with defending the class or representative action.

**10. ASSIGNABILITY/BINDING EFFECT**

This Guaranty shall be assignable by the Purchaser without notice to Guarantor and shall inure to the benefit of the Purchaser and to any subsequent successors and assigns. In the event of the death of Guarantor, this Guaranty shall continue in effect against the estate of Guarantor.

**11. SEVERABILITY**

If any provision of this Guaranty is in conflict with any statute or rule of law or is otherwise unenforceable for any reason, then that provision will be deemed null and void to the extent of the conflict or unenforceability and will be deemed severable, but it will not invalidate any other provision of this Guaranty.

**12. COMPLETE AGREEMENT**

This Guaranty is the final, complete and exclusive expression of the Agreement between Guarantor and the Purchaser with respect to the subject matter of this Guaranty. This Guaranty cannot be modified or amended except in a writing signed by both Guarantor and the Purchaser.

**13. GOVERNING LAW, VENUE AND JURSIDICTION**

This Personal Guaranty will be exclusively construed in accordance with the laws of the State of California, and will inure to the benefit of Purchaser, its successors and assigns. This Guarantee and each guarantor hereby agree to consent to the exclusive and mandatory venue and jurisdiction of any court of the state of California for all matters or in the United States District Court for the Southern

District of California. Guarantor agrees that any action or proceeding to enforce or arising out of this Agreement or Guaranty will be exclusively commenced and litigated in any court of the State of California or in the United States District Court for the Southern or Central District of California.

**Signer #1:** *Jacob Plank*
Jacob Plank (Sep 15, 2023 16:35 EDT)

**Signer #2:** _____

Name:     Jacob Plank

Name: _____

**Signer #3:** _____

Name: _____

**Signature:** *Sandra Otero*
Sandra Otero (Sep 15, 2023 13:36 PDT)

**Email:** nffunding@nationalfunding.com